# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

DAVID LEROY ZAMORA,

       Plaintiff,

v.                                                       CV 13-913 WPL

CAROLYN W. COLVIN, *Acting*
*Commissioner of the Social Security*
*Administration*,

       Defendant.

## MEMORANDUM OPINION AND ORDER

David Zamora filed an application for Supplemental Security Income ("SSI") on February 4, 2010. (Administrative Record ("AR") 11.) He alleges disability beginning February 4, 2010, due to arthritis. (AR 118, 140.) Administrative Law Judge ("ALJ") Ann Farris held a disability hearing on March 6, 2012. (AR 27-52.) On May 3, 2012, the ALJ determined that Zamora was not under a disability as defined by the Social Security Act and was therefore not entitled to benefits. (AR 8-26.) Zamora filed an appeal with the Appeals Council, but the Council declined his request, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (AR 1-6.)

Zamora sought review of the SSA's decision (Doc. 1) and filed an opposed Motion to Reverse and Remand Administrative Agency Decision (Doc. 18) and supporting Memorandum (Doc. 19). The Commissioner of the SSA ("Commissioner") responded (Doc. 20), and Zamora filed a reply (Doc. 22). After having read and considered the entire record and the relevant law, I

grant Zamora's motion and remand this case to the SSA for proceedings consistent with this opinion.

## STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). I may reverse and remand if the ALJ has failed "to apply the correct legal standards, or to show us that she has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. § 416.920(a)(4) (2014). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. § 416.920(a)(4), & Pt. 404, Subpt. P, App'x 1. If a claimant's impairments are not equal to one

of those in the Listing of Impairments, then the ALJ determines the claimant's residual functional capacity ("RFC").  *See* 20 C.F.R. § 416.920(e). At the fourth step, the ALJ compares the claimant's RFC with the functional requirements of his past relevant work to see if the claimant is still capable of performing his past work. *See* 20 C.F.R. § 416.920(f). If a claimant is not prevented from performing his past work, then he is not disabled. *Id.* The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden of proof shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987). If the claimant cannot return to his past work, then the Commissioner bears the burden, at the fifth step, of showing that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

### FACTUAL BACKGROUND

Zamora is a fifty-one-year-old man with an eleventh-grade education. (AR 118, 141.) From 1998 to 2009, Zamora worked as a laborer in the construction industry. (AR 141.) According to a disability report completed by Zamora, he stopped working on December 31, 2009, due to his medical conditions. (AR 140.)

The first medical record before the ALJ was dated January 18, 2010. Zamora visited the Presbyterian Hospital ("Presbyterian") emergency room and saw Stephen Pilon, M.D., for left shoulder pain and body aches. (AR 224.) Zamora rated his pain as 5/10. (AR 231.) Dr. Pilon found Zamora to be alert, in no acute distress, and with full range of motion in the left shoulder. (AR 231, 235.) An x-ray of Zamora's left shoulder revealed no abnormalities. (AR 230.) Dr. Pilon placed Zamora on ibuprofen, Valium, and Percocet. (AR 225.)

On February 16, 2010, Zamora saw Joseph R. Aragon, M.D., at Los Lunas Family Practice. (AR 262.) Zamora complained of a shoulder injury, back pain, blurry vision, and dizziness when tilting his head back. (*Id.*) Dr. Aragon ordered an MRI of the cervical spine and referred Zamora to New Mexico Orthopaedics. (*Id.*)

Zamora had an MRI of his cervical spine on March 2, 2010, at Presbyterian. (AR 266.) Luis Centenera, M.D., found that "[t]here are mild to moderate multilevel degenerative changes of the cervical spine with multilevel posterior osteophyte disc complexes most notably at the C4-5, C3-4 and C5-6 levels resulting in varying degrees of central stenosis and neural foraminal narrowing. The cervical cord is normal in signal intensity." (*Id.*)

On April 2, 2010, Zamora saw Jeremy Santos, M.D., a physical medicine and rehabilitation specialist at New Mexico Orthopaedics. In a written new-patient evaluation, Zamora provided that he does not drink alcohol, but he does smoke one pack of cigarettes per week. (AR 290.) He stated that it hurts him to walk or bend due to pain in his back, neck, legs, arms, and hands and that he sometimes feels weak. (AR 291.) Zamora further stated that moving around a lot worsens his symptoms. (*Id.*) During his examination by Dr. Santos, Zamora reported frequent headaches, some blurred vision, and pain rated 9/10 that is aggravated by any increase in physical activity. (AR 255.) Dr. Santos noted that Zamora's symptoms began many years before, likely after a motor vehicle accident. (*Id.*) Dr. Santos found no significant deformities of the shoulder or spine. (AR 257-58.) Zamora had full cervical flexion, moderately restricted cervical extension, and moderately restricted right rotation and mild left rotation. (AR 257.) Dr. Santos assessed Zamora with "1) chronic and progressively worsening cervical, thoracic and lumbar axial pain. 2) chronic bilateral upper extremity pain, numbness and subjective weakness. 3) chronic bilateral lower extremity subjective weakness." (AR 258.) Despite this assessment,

Dr. Santos noted that "a clear etiology of his symptoms is not discernible. Certainly I would consider the stenosis at two levels in the cervical spine which could result in neck and arm pain, as well as the numbness." (*Id.*) Dr. Santos did not recommend spine injections, but he did recommend an orthopedic spine surgery consultation. (*Id.*)

Also on April 2, 2010, Zamora completed a function report, in which he stated that he experiences a lot of pain, but that he has no problems with his personal care. (AR 157.) Further, Zamora wrote that he cooks his own meals, cleans, does laundry, goes grocery shopping, drives a car, and pays bills. (AR 158, 163.)

Kenneth Glass, M.D., a non-examining, consulting physician, completed a physical RFC assessment of Zamora on April 27, 2010. Dr. Glass noted a primary diagnosis of cervical spine spondylosis. (AR 295.) As to Zamora's functional capabilities, Dr. Glass found that Zamora could occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; stand or walk for six hours in an eight-hour workday; sit for a total of six hours in an eight-hour workday; and push or pull without limitation, except as provided by the lift/carry limitations. (AR 296.) Further, Dr. Glass found that Zamora has limited reaching in all directions, with the ability to reach overhead bilaterally occasionally, and that Zamora must avoid even moderate exposure to unprotected heights. (AR 297-99.)

On June 7, 2010, Zamora reported in an updated function report that he can take a shower but cannot do chores. (AR 178.) However, he could prepare his own meals, drive a car, and pay bills. (AR 180-81.) Zamora wrote that his brothers do the yard work, and his mother shops for him. (*Id.*) He also wrote that he can only walk one hundred feet before needing to stop and rest for twenty-five minutes. (AR 183.)

On July 22, 2010, Zamora underwent an MRI of his lumbar spine at New Mexico Orthopaedics. (AR 310.) The MRI showed a small right foraminal protrusion at L4-5, deforming the L4 dorsal root ganglion, and a slight disc bulging at L2-3. (*Id.*) On July 23, 2010, orthopaedic surgeon John D. Ray, M.D., on referral by Dr. Santos, did not find any surgical indications. (AR 309.) While Zamora continued to suffer from aches and pains, he moved his feet well. (*Id.*) Zamora showed some grip weakness in his hands. (*Id.*) The MRI of Zamora's lumbar spine was overall "quite benign" and revealed "very, very minimal degenerative changes," with no neural compression. (*Id.*)

Zamora returned to Dr. Santos on August 17, 2010, with similar pain complaints as in April 2010. (AR 313.) Zamora also complained of constant pain in his joints and of swelling in his hands. (*Id.*) Dr. Santos found that the majority of Zamora's symptoms were not related to degenerative changes in his spine, but rather might be from possible rheumatoid arthritis or some other auto immune disease. (AR 313-14.) Dr. Santos referred Zamora to rheumatologist James B. Steier, M.D., for an evaluation. (AR 314.)

On September 16, 2010, Jonathan Norcross, M.D., a non-examining, consulting physician, examined Zamora's entire file and affirmed Dr. Glass's physical RFC assessment. (AR 338.)

Zamora then saw Dr. Steier on October 6, 2010. Dr. Steier noted that Zamora complained of a fifteen-pound weight loss over the past few months, occasional blurry vision, chronic headaches, hypertension, dizziness, joint pain, joint stiffness, muscle weakness, muscle pain, fatigue, nausea, and abdominal pain with occasional cramps. (AR 347.) Dr. Steier found Zamora to be pleasant and in no visible distress. (*Id.*) He found no visible swelling, warmth, or redness in any joints, and Zamora's muscle strength was 5/5, with sensation grossly intact. (*Id.*) Dr. Steier

assessed Zamora with chronic diffuse pain involving the joints, neck, and low back—etiology uncertain—as well as chronic neck pain with burning at times and intermittent headaches. (*Id.*) Dr. Steier gave Zamora a trial of Neurontin and ordered an MRI and laboratory tests to check for inflammatory arthritis. (*Id.*; AR 346.) Zamora's November 19, 2010, MRI showed a few small foci of increased T2 weighted signal in scattered white matter tracts of both cerebral hemispheres. (AR 346.) Radiologist Fred Akiya, M.D., noted that in a patient of Zamora's age and appearance, the etiology for the finding was nonspecific. (*Id.*) Aside from these findings, Zamora had an otherwise normal MRI. (*Id.*)

Zamora again returned to Dr. Santos on May 12, 2011. Dr. Santos noted that Dr. Steier had seen Zamora in October 2010 and ordered laboratory studies. (AR 355.) However, according to Zamora, Dr. Steier "never shows up." (*Id.*) Zamora asked for and received a referral to another rheumatologist.

Zamora saw Dr. Steier for a follow-up appointment on May 20, 2011. According to Zamora, he was doing poorly. (AR 362.) Zamora reported no response to Neurontin, worsening neck pain, occipital headaches, blurry vision, achiness all over, and some depression and anxiety. (*Id.*) Dr. Steier found that Zamora had a limited range of motion of the cervical spine in all directions and that his paraspinal muscles were tender to palpation. (AR 344.) Dr. Steier assessed Zamora with chronic pain, etiology uncertain, and blurry vision. (*Id.*) Dr. Steier noted that Zamora does have some degenerative disc disease in the lumbar and cervical spine. (*Id.*) He referred Zamora to Dr. Santos for possible facet joint injections or other recommendations and to an ophthalmologist for blurry vision. (*Id.*) Dr. Steier provided a trial of Savella for chronic pain. (*Id.*)

On August 23, 2011, Zamora established care with nurse practitioner Leona Herrell, FNP-C, at Valencia Family Medicine. (AR 351.) Herrell found Zamora to be alert and afebrile, with normal gait. (*Id.*) She also found full range of motion to the back and normal strength in the upper and lower extremities. (AR 352.) Zamora followed up with Herrell on September 22, 2011. Zamora complained of increased pain to his neck and head beginning on September 19, 2011. (AR 349.) Zamora reported numbness to the arms, weakness to the legs, and a cracking sensation when he rotates his neck. (*Id.*) He stated that ibuprofen 800 mg helps some. (*Id.*) He also requested a handicapped parking permit. (*Id.*) Herrell found that Zamora was alert, ambulatory without a limp, with no abnormalities detected. (*Id.*) She advised him to stay as mobile as possible, which would be better than using a handicapped parking permit. (*Id.*) Herrell denied the permit. (*Id.*)

Zamora saw Dr. Santos for a follow up on September 27, 2011. Zamora complained of worsening neck pain; pain, numbness and weakness in his arms more so than in his legs; and dizziness when he looks up. (AR 353.) Dr. Santos found Zamora to be in no acute distress, with fluid movements, and no exhibition of pain behaviors. (AR 354.) Zamora's cervical range of motion was mildly limited in flexion, moderately limited with extension, mildly limited with left rotation, and moderately limited with right rotation. (*Id.*) His cervical paraspinals were tender to palpation. (*Id.*) Zamora exhibited 5/5 strength in the upper extremities and intact sensation. (*Id.*) Dr. Santos assessed Zamora with 1) chronic and progressively worsening cervical axial pain; 2) chronic thoracic and lumbar axial pain; 3) chronic bilateral upper extremity pain, numbness and subjective weakness; 4) chronic bilateral lower extremity subjective weakness; and 5) probably benign positional vertigo. (*Id.*) Dr. Santos again did not recommend spine injections. (*Id.*) However, Dr. Santos did want to determine whether Zamora was a "surgical candidate for the

stenosis in the cervical spine which could account for his extremity symptoms, as well as his neck pain." (*Id.*) Dr. Santos ordered another cervical spine MRI and referred Zamora to orthopedic surgeon Jose R. Reyna, Jr., M.D., and an ear/nose/throat specialist for the possible benign positional vertigo. (*Id.*) Dr. Santos noted that Zamora was not interested in seeing any other rheumatologists or in going to physical therapy. (*Id.*)

Zamora's MRI on October 15, 2011, revealed 1) C3-4: degeneration with mild impingement on the ventral aspect cervical cord, mild central canal narrowing; 2) C4-5: degeneration with mild impingement on and deformity of the ventral aspect of the cervical cord, mild central canal narrowing; and 3) C5-6: degeneration with mild retrolisthesis of C5 on C6, mild impingement on and deformity of the ventral aspect of the cervical cord, mild central canal narrowing, and mild narrowing of both neural foramina. (AR 359.)

Zamora visited Dr. Reyna on October 24, 2011. Zamora complained of increased lower extremity symptoms, including numbness and tingling, with the left lower extremity more troublesome than the right. (AR 364.) Dr. Reyna found Zamora to be alert, in no acute distress, and with normal gait. (*Id.*) Dr. Reyna assessed Zamora with 1) occipital neuralgia, 2) C4-5 and C5-6 degenerative disc disease, and 3) L5-S1 facet degenerative joint disease. (AR 365.) Dr. Reyna stated that Zamora "has multiple complaints which cannot be explained by his imaging studies," and he recommended continued nonoperative treatment. (AR 366.)

Zamora returned to Dr. Santos on January 20, 2012. Zamora complained that his "bones" hurt in his arms and legs and that his hands were stiff. (AR 367.) He also complained of pain along the cervical, thoracic, and lumbar spine. (*Id.*) Dr. Santos concluded that spinal injections would not be helpful. (*Id.*) He referred Zamora to rheumatology again. (*Id.*)

On March 1, 2012, Zamora followed up with Herrell. Zamora stated that he lived with his parents as their caregiver. (AR 368.) Zamora continued to complain of back pain and added a complaint about left knee pain, purportedly caused by an injury working with auto engines a year earlier. (*Id.*) Herrell observed normal gait and no obvious deformities or swelling in Zamora's left knee, though the ligaments popped with flexion and extension. (*Id.*) Herrell assessed Zamora with backache, unspecified, and limb pain. (*Id.*) She prescribed Tramadol, ordered an x-ray of his left knee, referred him to an orthopedic specialist for the knee pain, and advised him to keep an appointment with a rheumatologist scheduled for March 23, 2012. (*Id.*)

After the ALJ's decision, Zamora submitted additional medical evidence, some from prior to the ALJ's decision and some from after, to the Appeals Council. The first record newly submitted was dated October 29, 2003, when Zamora saw Roland Sanchez, M.D., for back, neck, hip, and shoulder pain as well as headaches linked to a motor vehicle accident when claimant was sixteen. (AR 378.) Dr. Sanchez found Zamora to be tender along the cervical paraspinals, and he assessed him with chronic neck pain, with complaints of headaches, and chronic left shoulder pain, with range of motion complaints. (*Id.*) Dr. Sanchez ordered an x-ray of the cervical spine and of the left shoulder and an MRI of the cervical spine and of the neck. (*Id.*) Radiologist James J. Sell, M.D., found no evidence of trauma; however, he found C4-5 and C5-6 degenerative disc disease. (AR 380-81.)

Approximately nine years later, on May 29, 2012, Zamora returned to Dr. Sanchez, reporting chronic back and bilateral leg pain, with a pain level of 9/10. (AR 377.) Dr. Sanchez assessed Zamora with cervical neck pain and prescribed hydrocodone. (*Id.*) He saw Zamora again on June 12, 2012. At that visit, Zamora reported pain rated 8/10. (AR 376.) Dr. Sanchez completed a Medical Opinion Re: Ability To Do Work-Related Activities. (AR 387.) In the

opinion, Dr. Sanchez provided that he had been treating Zamora for two months for degenerative joint disease, chronic back pain, and depression. (*Id.*) He found that Zamora could stand or walk for less than two hours a day, sit for less than two hours a day, and occasionally lift or carry ten pounds. (*Id.*) Further, Dr. Sanchez found that Zamora needs the freedom to shift at will between sitting or standing/walking, needs to lie down at unpredictable times during an eight-hour workday, and would miss work more than three times per month. (*Id.*) Dr. Sanchez later referred Zamora for a chronic pain evaluation and for x-rays of his cervical spine and shoulder. (AR 382, 384.) The record, however, does not include any results of such referrals.

### HEARING TESTIMONY

The ALJ held a hearing on March 6, 2012, at which Zamora and a Vocational Expert ("VE") testified. (AR 27-52.) Zamora was represented by an attorney. (*Id.*)

Zamora's attorney made a brief opening statement, in which he stated that Zamora has constant pain from injuries to his back, limited lifting capacity, neck problems causing headaches, and numbness in the extremities, and that he can sit or stand for no longer than twenty or thirty minutes. (AR 33.)

The ALJ asked Zamora several questions. Zamora testified that he has not worked since his alleged onset date of February 4, 2010, because of his injuries. (AR 33-34.) Zamora clarified for the ALJ that his doctors did not prescribe opiate pain medications until later in 2010. (AR 35.) Walking, sitting, and lifting objects trigger Zamora's pain, and his hands also become swollen. (*Id.*) Zamora claimed that he drops objects because his hands get stiff in the mornings and evenings, and he becomes dizzy and experiences blurry vision from his medications. (AR 36, 40.) When the ALJ asked whether Zamora was going to physical therapy, Zamora said he was not because "they" did not want to give him therapy until he had a diagnosis from a

rheumatologist. (AR 36.) As to whether Zamora had been seeing a rheumatologist, Zamora noted that he had seen Dr. Steier, but that the doctor did not show up for five of his appointments. (AR 36-37.)

Zamora testified that he lives with his parents. (AR 37.) He sometimes has trouble dressing and can no longer do yard work, but he can drive, sometimes do laundry, cook, go grocery shopping with his mother, and sometimes sweep and vacuum. (AR 37-38.) Zamora testified that he cannot lift his arms higher than his head. (AR 38.) He does not do things for fun or have hobbies. (AR 39.) On a typical day, Zamora gets up around 10:00 or 10:30 a.m. because he "can't move." (*Id.*) Once his "body settles," he can get up and take a shower, take out the trash, and move around a bit. (*Id.*) Zamora must take naps during the day. (AR 41.) In the evening, Zamora watches television. (AR 40.) However, while watching television, Zamora must alternate between standing, sitting, and walking around. (*Id.*)

Zamora testified that he would be stooped forward the next day, with problems in his arms and hands, if he did any kind of physical work. (AR 42.) Zamora opined that he would not be able to attend work at all because of the pain he experiences. (AR 43.) Even with a part-time job, Zamora believed that he would be fired. (*Id.*) Zamora testified that he can sit for perhaps fifteen to twenty minutes before he must change position and stand—with some movement—for about thirty minutes before having to change position again. (AR 44.)

Zamora stated that his pain was worse at the time of the hearing than it was in February 2010. (AR 45.) Zamora asserted that it is hard to walk now because of his knees, and he said that in February 2010 he could sit for about an hour and stand in place—without needing movement—for about thirty minutes. (AR 45-46.)

Zamora testified that he has an appointment with a rheumatologist on March 23, 2012.[1] (AR 46.)

The ALJ next questioned the VE. (AR 47-49.) The ALJ confirmed with the VE that the VE's testimony must be in accord with the Dictionary of Occupational Titles ("DOT"). (AR 48.) The VE agreed to tell the ALJ about any variations between the VE's testimony and the DOT. (*Id.*) The ALJ then asked the VE to assume a person of Zamora's age, education, and work history who is limited to light-exertional work but must be able to alternate between sitting and standing—that is, change positions—briefly, approximately hourly; who can occasionally reach overhead but who has no other problems reaching; who can frequently but not constantly handle and finger; and who should avoid exposures to hazardous conditions including unprotected heights and dangerous moving machinery. (AR 48-49.) The VE testified that such a person could not perform Zamora's previous work. (AR 49.) However, such a person could work as an assembler of small products (500 jobs in New Mexico; 50,000 nationally), a booth cashier (10,000 jobs in New Mexico; 1,750,000 nationally), or an electronics worker (300 jobs in New Mexico; 25,000 nationally). (*Id.*)

Zamora's attorney then questioned the VE. (AR 49-51.) Zamora's attorney asked whether the job numbers provided were numbers specific to the DOT occupations listed. (*Id.*) The VE stated that, for some occupations, the numbers are for a broader Occupational Employment Survey group of jobs containing the specific occupations. (AR 49-50.) Upon questioning by Zamora's attorney, the VE also affirmed that for the booth cashier job numbers, only 48.3% were full-time jobs. (AR 51.)

---

[1] Zamora did not submit any documentation from an appointment on this date.

### THE ALJ AND APPEALS COUNCIL'S DECISIONS

The ALJ reviewed Zamora's application for benefits according to the sequential evaluation process. (AR 8-26.) At the first step, the ALJ found that Zamora had not engaged in substantial gainful activity since February 4, 2010, the application date and alleged onset date. (AR 13.) Then, at the second step, the ALJ concluded that Zamora suffers from the severe impairments of degenerative disc disease of the cervical spine and subjective weakness— probably benign positional vertigo. (*Id.*) At step three, the ALJ found that Zamora's combination of severe impairments did not equal one of the listed impairments. (*Id.*)

The ALJ then determined Zamora's RFC, finding that Zamora could perform less than the full range of light exertional work, subject to the following limitations: he must be able to change positions between sitting and standing for a brief period approximately hourly; he must avoid exposure to hazardous conditions, including unprotected heights and dangerous moving machinery; and he can occasionally reach overhead and frequently handle and finger. (*Id.*)

In making the RFC assessment, the ALJ noted Zamora's testimony at the hearing, including his physical complaints and his ability to do activities of daily living. (AR 14.) However, the ALJ found that Zamora's statements regarding the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the RFC. (*Id.*) The ALJ summarized the record in detail chronologically, including function reports, Zamora's complaints to his medical providers, and the providers' observations and findings. (AR 17.) The ALJ's summary omitted some visits from the record, including Zamora's January 18, 2010, visit to the Presbyterian emergency room; his February 16, 2010, visit to Dr. Aragon; his August 17, 2010, visit to Dr. Santos; his October 6, 2010, visit to Dr. Steier; his May 12, 2011,

visit to Dr. Santos; his May 20, 2011, visit to Dr. Steier; his August 23, 2011, visit to Herrell; and his January 20, 2012, visit to Dr. Santos.

The ALJ reasoned that Zamora described daily activities that were inconsistent with his alleged symptoms and limitations. (AR 17.) The ALJ emphasized Herrell's denial of a handicapped parking permit and advice that Zamora remain as mobile as possible. (*Id.*) The ALJ pointed out that Dr. Reyna found Zamora to ambulate with a normal gait, to have 5/5 motor strength, and to have multiple complaints, which could not be explained by the imaging studies. (*Id.*) Further, the ALJ noted that Dr. Ray did not find any surgical indications for Zamora. (*Id.*) The ALJ found that the opinions of the state agency medical consultants—Dr. Glass and Dr. Norcross—were consistent with the evidence of record, and she concurred with their findings. (*Id.*) With regard to subjective weakness, probably benign positional vertigo, the ALJ stated that there was very little medical evidence as to this condition, but she considered it a severe impairment nonetheless. (*Id.*) Finally, the ALJ found inconsistencies between Zamora's testimony and subjective complaints throughout the record and the medical evidence. (*Id.*)

The ALJ concluded at step four that Zamora could not perform past relevant work. (AR 18.) Nonetheless, at step five, the ALJ found that, considering Zamora's age, education, work experience, RFC, and the testimony of the VE, Zamora could perform the work of an assembler of small products; a cashier, particularly a booth cashier; and an electronics worker. (AR 18-19.) As the ALJ determined that Zamora could perform jobs existing in substantial numbers in the national economy, the ALJ concluded that Zamora was not disabled. (AR 19.)

Zamora appealed the decision to the Appeals Council, but the Council found that Zamora's reasons for disagreeing with the hearing outcome did not justify a review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner. (AR 1-6.)

The Appeals Council stated that it looked at the additional evidence provided, including the records from Dr. Sanchez and Zamora's former attorney's brief dated June 25, 2012. (AR 1, 5.) The Appeals Council stated that it "considered whether the [ALJ's] action, findings or conclusion is contrary to the weight of evidence of record. We found that this information does not provide a basis for changing the [ALJ's] decision." (AR 2.)

**DISCUSSION**

Zamora makes three primary arguments in support of reversing and remanding his case. First, Zamora argues that the Appeals Council failed to conduct a proper analysis of Dr. Sanchez's Medical Opinion Re: Ability To Do Work-Related Activities. Second, he asserts that the ALJ's RFC is not supported by substantial evidence. Finally, Zamora contends that at step five, the ALJ committed legal error by failing to follow Social Security Ruling ("SSR") 00-4p, 2000 WL 1898704 (Dec. 4, 2000),[2] and reached a conclusion not supported by substantial evidence. I note that Zamora added in his reply an argument about a conflict between the DOT occupations listed by the VE and the RFC limitation of only occasionally reaching overhead. Because Zamora did not bring this argument in his motion, I do not review the argument. *See Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000).

**I.      Appeals Council's Treatment of Evidence from Dr. Sanchez**

Zamora cites *Harper v. Astrue*, 428 F. App'x 823, 826-27 (10th Cir. 2011) (unpublished), for the proposition that the Appeals Council must conduct the treating physician analysis when evaluating the opinion of a treating physician. Further, Zamora cites 20 C.F.R. § 404.1527(e)(3)

---

[2] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35; *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

for the concept that "when the Appeals Council makes a decision, it will follow the same rules for considering opinion evidence as administrative law judges follow." (Doc. 19 at 11.) As such, Zamora argues that the case should be remanded so that the SSA can "provide an analysis of treating Dr. Sanchez's opinion regarding the severity of Mr. Zamora's impairments, and how they affect ability to work." (*Id.*)

The Commissioner argues that Zamora has failed to show that Dr. Sanchez's reports relate back to the period on or before the date of the hearing decision. Further, the Commissioner contends that Zamora improperly characterized Dr. Sanchez as a treating physician because Dr. Sanchez merely listened to Zamora's subjective complaints after the ALJ's decision and filled out a checkbox evaluation form.

Evidence not before the ALJ may be presented to the Appeals Council and "becomes part of the administrative record to be considered when evaluating the [Commissioner's] decision for substantial evidence." *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994). However, this "new evidence" must relate to the period on or before the date of the ALJ's decision. *See id.* at 858; 20 C.F.R. § 416.1470(b) ("[I]f new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision."). Where the Appeals Council makes new evidence part of the record but does not explicitly state that the evidence is new, material, and chronologically pertinent, the Tenth Circuit has determined that this implies that the Appeals Council found that the claimant provided "qualifying new evidence for consideration." *Martinez v. Barnhart*, 444 F.3d 1201, 1207 (10th Cir. 2006). I therefore consider the records from Dr. Sanchez to be qualifying new evidence.

When qualifying new evidence is submitted, the Appeals Council must consider the entire record, including the qualifying new evidence, to determine whether the ALJ's decision "is contrary to the weight of the evidence currently of record." 20 C.F.R. § 416.1470(b); *see Chambers v. Barnhart*, 389 F.3d 1139, 1143 (10th Cir. 2004). After the Appeals Council reviews the entire record—including the qualifying new evidence—under the standard provided in 20 C.F.R. § 416.1470(b), the court may "properly review the denial of benefits . . . under the deferential substantial-evidence standard." *Chambers*, 389 F.3d at 1143.

As Zamora points out, there is some disagreement in the Tenth Circuit regarding the Appeals Council's discussion of new evidence from a treating physician. Assuming for now that Dr. Sanchez was a treating physician, I examine the pertinent cases in the Tenth Circuit. In *Robinson v. Astrue*, one of the claimant's treating physicians completed a physical RFC assessment the day after the ALJ denied benefits. 397 F. App'x 430, 432 (10th Cir. 2010) (unpublished). The Appeals Council made the evidence part of the record, but "decided it did not provide a basis for changing the ALJ's decision and denied review." *Id.* The claimant argued that the Appeals Council erred by failing to provide an analysis of the new evidence. *Id.* The court concluded that the Appeals Council's brief explanation that there was no basis to change the ALJ's decision was sufficient: "[O]ur general practice . . . is to take a lower tribunal at its word when it declares that it has considered a matter." *Id.* (quoting *Hackett v. Barnhart*, 395 F.3d 1168, 1172-73 (10th Cir. 2005)).

The *Robinson* court cited *Martinez*, 444 F.3d 1201. In *Martinez*, a treating physician wrote a letter on remand that was more restrictive than the RFC. *Id.* at 1206. The ALJ did not "afford any credit to [the] reported limitations because they [were] not corroborated by any supporting treatment records and [the doctor's] statements are inconsistent with the other reports

18

of treating sources in the record." *Id.* at 1207 (quoting ALJ's decision). The claimant later submitted such supporting treatment records to the Appeals Council. *Id.* The claimant argued that the Appeals Council erred by failing to specifically discuss whether the treatment records undercut the ALJ's rejection of the opinions set forth in the letter. *Id.* The court found that the Appeals Council "adequately considered the additional evidence." *Id.* (quotation and punctuation omitted). The court noted that the claimant cited to no statutes or regulations requiring a more detailed analysis of new evidence where the Appeals Council denies review. *Id.* at 1208. The court then proceeded to determine whether substantial evidence supported the ALJ's decision. *Id.*

In *Harper v. Astrue*, the claimant had seen a particular treating physician twenty times during a two-year period, records from only seventeen of which visits were provided to the ALJ. 428 F. App'x 823, 825 (10th Cir. 2011) (unpublished). Among the evidence before the ALJ was the physician's opinion that the claimant could not drive or sit for more than one hour per day. *Id.* The ALJ did not mention the physician even once in his decision. *Id.* At the Appeals Council stage, the claimant submitted the records from the remaining three visits, as well as two medical reports in which the physician further explained his opinion as to the claimant's functional abilities. *Id.* Without other explanation, the Appeals Council found that the new evidence did "not provide a basis for changing the [ALJ's] decision." *Id.* at 826 (quoting Appeals Council decision). The court remanded the case because the doctor "imposed significant restrictions on [claimant's] ability to work that were never discussed by either the ALJ or the Appeals Council." *Id.* at 827. That is, neither the ALJ nor the Appeals Council applied the treating physicians rule to accord weight to the opinions of the physician. *See id.* at 826.

In *Stills v. Astrue*, one of the claimant's treating physicians submitted a Physical Medical Source Statement form after the ALJ's decision. 476 F. App'x 159, 160 (10th Cir. 2012)

19

(unpublished). One or more of the treating physician's opinions conflicted with the RFC. *Id.* at 161. The Appeals Council found that the new evidence did "not provide a basis for changing the [ALJ's] decision." *Id.* (quoting Appeals Council decision). In response to the Commissioner's argument that "a treating physician analysis is not legally required when a treating physician's opinion is submitted to the Appeals Council as additional evidence," the court stated that the issue is not settled in the Tenth Circuit.[3] *Id.* at 161-62. The case was remanded on other grounds. *Id.* at 162.

District courts within the Tenth Circuit have tended to apply *Robinson* and *Martinez*, as opposed to *Harper*. For example, in *Beardsley v. Colvin*, the claimant objected to a magistrate judge's Report and Recommendation, arguing that the Appeals Council erred in failing to discuss a physician's opinion using the factors in the treating physicians rule. No. CIV-12-760-D, 2013 WL 3992253, at *2 (W.D. Okla. Aug. 2, 2013) (unpublished). Instead, the Appeals Council simply found that there was no basis to change the ALJ's decision. *Id.* The court noted that several district courts in the Tenth Circuit have held that the Appeals Council is not required to include a written analysis of new evidence when it declines review. *Id.* at *3 (citing *Burger v. Astrue*, 2013 WL 1222371, at *4 (D. Colo. Mar. 26, 2013) (unpublished); *Davison v. Astrue*, 2012 WL 4214896, at *4 (D. Kan. Sept. 18, 2012) (unpublished); *Johnson v. Astrue*, 2012 WL 2886687, at *7 (N.D. Okla. July 13, 2012) (unpublished); *Jackson v. Astrue*, 2012 WL 831351, at *3 (W.D. Okla. Feb. 13, 2012) (unpublished)). In only one case did a district court follow *Harper*, only to "err on the side of caution." *Id.* (quoting *Pacheco v. Astrue*, 2013 WL 2030964, at *7 (D. Colo. May 14, 2013) (unpublished)). As such, the court found that "the Appeals

---

[3] The court cited *Harper*, 428 F. App'x 823, and *Robinson*, 397 F. App'x 430, for comparison. *Stills*, 476 F. App'x at 162.

Council did not err in failing to discuss the new evidence or to apply the treating physician analysis." *Id.* at *4.

Based on prior caselaw in the Tenth Circuit tending to find sufficient an Appeals Council's conclusion that there is no basis upon which to change the ALJ's decision, I find that the Appeals Council did not err in this case by failing to elaborate on the new evidence, including a treating physician analysis. Further, I find that *Harper* may be distinguished from the instant case and others cited in that the ALJ in *Harper* failed to discuss the treating physician, despite seventeen known visits at the time and his opinion that the claimant could sit for no more than one hour per day. 428 F. App'x at 825. While all of the cases discussed, including the instant case, involved new evidence that was not analyzed in a detailed, written discussion by the Appeals Council, *Harper* also involved extensive information completely omitted by the ALJ. *See id.* I also note that the regulation cited by Zamora for the proposition that the Appeals Council must "follow the same rules for considering opinion evidence as [ALJs] follow," 20 C.F.R. § 404.1527(e)(3), applies to the opinions of nonexamining sources under Disability Insurance Benefits. As Dr. Sanchez examined Zamora, and Zamora seeks SSI benefits, the cited regulation is inapplicable to this case.

## II.     Whether the RFC Is Supported by Substantial Evidence

Zamora next argues that the RFC is not supported by substantial evidence. He points to two specific issues impacting the RFC. First, Zamora argues that the new evidence from Dr. Sanchez undercuts the ALJ's RFC. Second, Zamora contends that the ALJ failed to fully consider his positional vertigo in her RFC assessment.

With regard to the first issue, Zamora asserts that Dr. Sanchez's opinion should be given controlling weight because his opinion "is supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with other substantial evidence of record." (Doc. 19 at 12 (citing *Hamlin*, 365 F.3d at 1215; *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004)).) The Commissioner disputes whether Dr. Sanchez had a treating relationship with Zamora, as well as Zamora's contention that Dr. Sanchez's opinions were not inconsistent with other substantial evidence of record.

As previously noted, the Court reviews the entire record, including qualifying new evidence, to determine whether the ALJ's decision is supported by substantial evidence. *See Chambers*, 389 F.3d at 1143. In considering new medical evidence, courts have conducted a treating physician analysis to determine the weight to assign such new evidence. *See Beardsley*, 2013 WL 3992253 at *4 ("[T]he Magistrate Judge discussed the treating physician analysis to be applied under the governing law, accurately set out the factors to be considered, and applied these to [the doctor's] new evidence.").

Pursuant to 20 C.F.R. § 416.927(c), "[r]egardless of its source, [the ALJ] will evaluate every medical opinion [he or she] receive[s]. Unless [the ALJ] give[s] a treating source's opinion controlling weight under paragraph (c)(2) of this section, [the ALJ] consider[s] all of the following factors in deciding the weight [to] give to any medical opinion."[4] As such, I must first

---

[4] These factors include:

(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Krauser v. Astrue*, 638 F.3d 1324, 1331 (10th Cir. 2011); *see also* 20 C.F.R. § 416.927(c)(2).

determine whether Dr. Sanchez is a treating physician whose opinions are entitled to controlling weight under paragraph (c)(2).

The Commissioner argues that Zamora "improperly described Dr. Sanchez as a treating physician, with the apparent desire that this Court accord his opinion greater weight, but Dr. Sanchez did not treat [Zamora] during the relevant period." (Doc. 20 at 5.) The Commissioner provides no support or explanation for the proposition that Zamora's May 29 and June 12, 2012, visits to Dr. Sanchez were outside the "relevant period." Further, it is clear from the record that Dr. Sanchez provided treatment to Zamora: 1) On May 29, 2012, Dr. Sanchez assessed Zamora with cervical neck pain and prescribed hydrocodone (AR 377); and 2) on June 27, 2012, subsequent to Zamora's second appointment, Dr. Sanchez ordered x-rays of Zamora's cervical spine and of his shoulder and referred Zamora to a pain management specialist (AR 382, 384).

Accordingly, with respect to treating doctors, an ALJ must complete a sequential two-step process for evaluating a medical opinion. *See Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). First, the ALJ must decide whether a treating doctor's opinion commands controlling weight. *Id.* A treating doctor's opinion must be accorded controlling weight "if it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Id.* (citing *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (applying SSR 96-2p, 1996 WL 374180, at *2 (July 2, 1996)). If a treating doctor's opinion does not meet this standard, the opinion is still entitled to deference to some extent as determined under the second step of the process. *Id.* In this second step, the ALJ must determine the weight to accord the treating physician by analyzing the treating doctor's opinion against the several factors provided in 20 C.F.R. § 416.927(c), listed above.

Upon examination of the records from Dr. Sanchez, I note that the May 29, 2012, record states that Zamora was there to establish care. (AR 377.) Further, Dr. Sanchez's Medical Opinion Re: Ability To Do Work-Related Activities states that Dr. Sanchez had been treating Zamora for two months. (AR 387.) There is no mention of Zamora's October 29, 2003, visit. Even though Dr. Sanchez referred Zamora for laboratory tests in 2003, there is no indication in the record that Dr. Sanchez ever saw the results of those tests. (*See* AR 380-83.) Therefore, I focus on the 2012 records.

While Dr. Sanchez ordered x-rays for Zamora on June 27, 2012 (AR 384), Dr. Sanchez completed his Medical Opinion Re: Ability To Do Work-Related Activities on June 12, 2012 (AR 387). There is also no indication from the record whether Zamora ever received his x-rays or Dr. Sanchez reviewed the results from them. The notes from May 29, 2012, state Zamora's subjective complaints about chronic back and bilateral leg pain, and his rated pain of 9/10. (AR 377.) There is no indication that Dr. Sanchez performed any testing whatsoever, whether physical observation/manipulation or a laboratory test. Nor do Dr. Sanchez's notes from June 12, 2012, reflect physical observations or testing of any kind. (AR 376.)

The Tenth Circuit has found that "[a] physician's opinion is . . . not entitled to controlling weight on the basis of a fleeting relationship, or merely because the claimant designates the physician as her treating source." *Luttrell v. Astrue*, 453 F. App'x 786, 793 (10th Cir. 2011) (unpublished) (quotation omitted). I find that Dr. Sanchez's opinions are not "well-supported by medically acceptable clinical or laboratory diagnostic techniques." *Krauser*, 638 F.3d at 1330 (citing SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996)). Because I find that the first requirement to receive controlling weight as a treating physician has not been met, I proceed to the factors laid out in 20 C.F.R. § 416.927(c)(2). *See id.*

24

With regard to the length of the treatment relationship and the frequency of examination, Zamora saw Dr. Sanchez in 2003 and in May and June of 2012. (AR 376-78.) "When the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment, [the ALJ] will give the source's opinion more weight than . . . if it were from a nontreating source." 20 C.F.R. § 416.927(c)(2)(i). The record does not reflect an extensive treatment relationship. *See, e.g.*, *Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003) (finding that a physician who saw claimant twice in seven years is not entitled to controlling weight). As to the nature and extent of the treatment relationship, per previous discussion, Dr. Sanchez ordered x-rays, but there is no indication of other testing performed or that Dr. Sanchez reviewed any resulting x-rays. 20 C.F.R. § 416.927(c)(2)(ii). Nor is there other relevant evidence to support Dr. Sanchez's opinion about Zamora's functional abilities beyond Zamora's own subjective complaints. *Id.* § 416.927(c)(2)(iii). In addition, Dr. Sanchez is a family physician, not a specialist. *Id.* § 416.927(c)(2)(v).

Dr. Sanchez's opinion is also inconsistent with the record as a whole. *Id.* § 416.927(c)(2)(iv). As emphasized by the ALJ, Dr. Reyna found Sanchez to have a normal gait, 5/5 strength, and complaints that could not be explained by the imaging studies. (AR 17, 364-66.) The ALJ also highlighted Herrell's refusal to provide a handicapped parking permit (AR 17, 368) and Dr. Ray's finding of no surgical indications (AR 17, 309). The MRI ordered by Dr. Ray was "quite benign" and revealed "very, very minimal degenerative changes." (AR 309.) In addition, Dr. Santos did not recommend spine injections, did not see "a clear etiology of [Zamora's] symptoms," and he found Zamora to exhibit fluid movements with no exhibition of pain behaviors. (AR 258, 354.) Furthermore, non-examining, consulting physicians Dr. Glass and Dr. Norcross approved an RFC with substantially greater capabilities than that of the RFC

proposed by Dr. Sanchez. (AR 296-99, 338.) Given the record as a whole, I conclude that Dr. Sanchez's opinion is entitled to little weight and does not undercut the ALJ's RFC.

Zamora also argues that the ALJ did not fully consider his positional vertigo in her RFC assessment. While the ALJ addressed Zamora's positional vertigo in the RFC by providing that Zamora must "avoid exposures to hazardous conditions including unprotected heights and dangerous moving machinery" (AR 13), Zamora contends that the ALJ should have included a limitation about avoiding rapid positional changes.

While the claimant has the burden of demonstrating that he is entitled to benefits, a social security disability hearing is nevertheless a nonadversarial proceeding. *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006).  Therefore, "[t]he ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993); *see Madrid*, 447 F.3d at 790. The ALJ's "basic duty of inquiry" requires him "'to inform himself about facts relevant to his decision and to learn the claimant's own version of those facts.'" *Dixon v. Heckler*, 811 F.2d 506, 510 (10th Cir. 1987) (quoting *Heckler v. Campbell*, 461 U.S. 458, 471, 471 n.1 (1983) (Brennan, J., concurring)). This duty is heightened when the claimant is proceeding pro se. *Younger on Behalf of Younger v. Shalala*, 30 F.3d 1265, 1267 (10th Cir. 1994) (citation omitted). However, when the claimant is represented by an attorney, "the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present [the] claimant's case in a way that the claimant's claims are adequately explored, and the ALJ may ordinarily require counsel to identify the issue or issues requiring further development." *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (quotations and citation omitted).

The ALJ specifically asked Zamora about positional vertigo during the hearing. (AR 36.) Zamora clarified that he experiences vision blurriness and sometimes gets dizzy when he stands up. (*Id.*) At no time did Zamora's attorney ask Zamora or the VE additional questions about the positional vertigo and resulting work limitations. As such, I find that the ALJ met her basic duty of inquiry, and any further development of the issue would have been required of Zamora's counsel at the hearing.

Based on the foregoing, I find that the RFC is supported by substantial evidence.

### III.    Failure to Follow SSR 00-4p

Zamora's final argument is that at step five, the ALJ committed legal error by failing to follow SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000), and reached a conclusion not supported by substantial evidence. While the RFC contained a restriction that Zamora must be able to change positions between sitting and standing approximately hourly (AR 13), the ALJ recognized in her decision that the VE's testimony was inconsistent with the DOT in that the DOT did not address a sit/stand option for the jobs that the VE testified Zamora could perform (AR 19). Nonetheless, the ALJ stated, "[T]here is a reasonable explanation for the discrepancy. The [DOT] does not address a sit/stand option. I rely on the expertise of the [VE] in addressing this limitation." (AR 19.)

Zamora asserts that after the VE provided his testimony, the ALJ did not question the VE about whether the testimony "provided conflict[ed] with information provided in the DOT." (Doc. 19 at 15 (citing SSR 004-p, 2000 WL 1898704, at *4).) Further, Zamora contends that the ALJ did not ask the VE to clarify whether the jobs listed by the VE could be performed with a sit/stand option. The Commissioner responds that Zamora has assumed that the three jobs listed by the VE require a full range of light work activities, but that such an assumption is improper.

The Commissioner states that Zamora has not proven that his abilities conflict with those required by the three jobs.

SSR 00-4p places on the ALJ an "affirmative responsibility to ask about any possible conflict between the VE . . . evidence and information provided in the DOT." 2000 WL 1989704, at *4. "When there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled." *Id.* *2. Further, "[n]either the DOT nor the VE . . . evidence automatically 'trumps' when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information." *Id.* The ALJ must then articulate the reasonable explanation in his or her decision. *Id.* at *4.

The Tenth Circuit has specifically discussed the requirement that an ALJ reconcile the VE's testimony with the DOT when rendering a decision. *Haddock v. Apfel*, 196 F.3d 1084, 1091 (10th Cir. 1999). The court held that

> before an ALJ may rely on expert vocational evidence as substantial evidence to support a determination of nondisability, the ALJ must ask the expert how his or her testimony as to the exertional requirement of identified jobs corresponds with the [DOT], and elicit a reasonable explanation for any discrepancy on this point.

*Id.* at 1087. *Haddock* explains that "reasonable explanation[s]" would include the job the VE testifies about not being included in the DOT, as the Dictionary is self-avowedly not comprehensive, or that there is a specified percentage of a given job performed at a different or lower RFC, as the DOT describes maximum job requirements, and the VE may have knowledge of how the job is performed in a particular setting. 196 F.3d at 1091-92. Though the Tenth

Circuit held that an ALJ may not "unreservedly accept" a VE's testimony when it contradicts the DOT, *id.* at 1091, a reasonable explanation includes the VE testifying from his or her professional experience, *Rogers v. Astrue*, 312 F. App'x 138, 142 (10th Cir. 2009) (unpublished). *Haddock* involved an RFC assessment with a sit/stand requirement. 196 F.3d at 1086. The Tenth Circuit remanded the case because the ALJ failed to ask the VE whether the claimant could perform the jobs listed by the VE, which the DOT showed required a higher exertional capacity than that provided by the RFC. *Id.* at 1086-87.

As cited by Zamora, the decision of the same ALJ as in this case was reversed and remanded in *Duran v. Colvin* for the ALJ's failure to resolve a conflict between the VE's testimony and the DOT with regard to a sit-stand option required by the claimant. *Duran v. Colvin*, No. 12-cv-739 SMV, Doc. 27 at 9-10 (D.N.M. Oct. 10, 2013) (unpublished). In that case, like in this case, the ALJ asked the VE to advise her whether any of the VE's testimony conflicted with the DOT, yet the VE failed to so give notice. *Id.* at 10; (AR 48.) Upon writing her decision, the ALJ stated that "[a]lthough the [VE's] testimony is inconsistent with the information contained in the [DOT], there is a reasonable explanation for the discrepancy. The DOT does not address [a] sit/stand option." *Id.* at Doc. 17 Ex. 3 at 20. The court concluded that the ALJ properly asked the VE to tell her whether his testimony was consistent with the DOT, but that when "[t]he ALJ found that the VE's testimony conflicted with the DOT, . . . she failed to resolve the conflict. Identifying that the DOT does not address a sit-stand option . . . does nothing to *resolve* the conflict. This constitutes reversible error that must be addressed on remand." *Id.* at Doc. 27 at 10 (emphasis in original).

In the instant case, the ALJ added one sentence to her paragraph about the conflict between the VE's testimony and the DOT: "I rely on the expertise of the [VE] in addressing this

limitation." (AR 19.) This sentence adds nothing to the requisite resolution of the conflict. Instead, as in *Duran*, the ALJ treated the VE's testimony as trumping that of the DOT, and the ALJ impermissibly, unreservedly accepted the VE's testimony. Therefore, the ALJ committed reversible error, and the case must be remanded to address the conflict between the VE's testimony and the DOT and elicit a reasonable explanation for the conflict before the ALJ can rely on the VE's testimony as substantial evidence. *See Haddock*, 196 F.3d at 1091.

## CONCLUSION

I find that the Appeals Council did not err by failing to conduct a treating physician analysis of the new evidence by Dr. Sanchez. I further find that the ALJ's RFC is supported by substantial evidence. However, I conclude that the ALJ committed reversible error in failing to follow SSR 00-4p's requirement that the ALJ elicit a reasonable explanation for the conflict between the VE's testimony and the DOT before relying on the VE's testimony as opposed to the DOT information. Accordingly, I grant the motion to remand this case to the SSA for further proceedings consistent with this opinion.

IT IS SO ORDERED.

William P. Lynch
United States Magistrate Judge

30

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.